UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SERGEANTS BENEVOLENT ASSOCIATION
HEALTH AND WELFARE FUND, *et al.*,

                Plaintiffs,

    -against-

SANOFI-AVENTIS U.S. LLP, *et al.*,

                Defendants.
------------------------------------------------------------x

**MEMORANDUM AND ORDER**

08-CV-179 (SLT) (RER)

**TOWNES, United States District Judge:**

In January 2008, plaintiffs Sergeants Benevolent Association Health and Welfare Fund

("SBA"), New England Carpenters Health Benefits Fund ("NEC") and Allied Services Division

Welfare Fund ("ASD") (collectively "Plaintiffs") and others commenced this action on behalf of

themselves and others similarly situated, principally alleging that defendants sanofi-aventis U.S.

LLP and sanofi-aventis U.S., Inc. (collectively, "Defendants") violated the Racketeer Influenced

and Corrupt Organizations Act "(RICO"), 18 U.S.C. § 1961 *et seq.*, and various state laws by

misrepresenting the safety and efficacy of Ketek, a prescription antibiotic marketed by

Defendants. In December 2011—after this Court denied Plaintiffs' motion to certify a

nationwide class—Defendants moved for summary judgment. By order dated January 4, 2012,

this Court referred the motion to Magistrate Judge Ramon E. Reyes ("Judge Reyes") for a report

and recommendation.

On September 17, 2012, Judge Reyes issued his report and recommendation (the

"R&R")—*Sergeants Benev. Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S., LLP*, No. 08-

CV-0179 (SLT) (RER), 2012 WL 4336218 (E.D.N.Y. Sept. 17, 2012) ("*Sergeants III*")—which

recommends that Defendants' motion for summary judgment be granted in its entirety. On

October 4, 2012, Plaintiffs collectively filed objections to almost every aspect of the R&R. For the reasons set forth below, this Court, having conducted a de novo review of those portions of the R&R to which Plaintiffs object, now adopts Judge Reyes' R&R except to the extent that it recommends limiting Plaintiffs' cause of action for violations of various consumer protection statutes to claims brought pursuant to the laws of Plaintiffs' home states of New York, Massachusetts and Illinois. However, Defendants are granted leave to file a second motion for summary judgment once Plaintiffs clarify the scope of their state-law claims under Counts III and IV of the Second Amended Complaint.

## BACKGROUND

In setting forth the facts of this case, the R&R incorporates by reference a much more detailed statement of facts contained in Judge Reyes' report and recommendation on Plaintiffs' motion for class certification (the "Prior R&R"): *Sergeants Benev. Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S., LLP*, No. 08-CV-0179 (SLT) (RER), 2011 WL 824607 (E.D.N.Y. Feb. 16, 2011) ("*Sergeants I*"), *adopted*, 2011 WL 1326365 (E.D.N.Y. Mar. 30, 2011) ("*Sergeants II*"). The Prior R&R itself largely relied on facts set forth in Plaintiffs' Second Amended Complaint and Plaintiffs' Proffer of Facts in Support of the Motion for Class Certification ("Plaintiffs' Proffer").

The following summary of the facts in this case relies, in part, on the Prior R&R. As indicated by the citations contained in the Prior R&R, not all of these facts may be undisputed. However, to the extent that the facts are disputed, the following summary is based on Plaintiffs' version of events.

Defendants are United States subsidiaries of sanofi-aventis SA, a French pharmaceutical firm (Sec. Am. Complt., ¶¶ 5-6; Answer, ¶¶ 5-6). According to Defendants, the corporation named by Plaintiffs as Sanofi-Aventis U.S., Inc. is actually named sanofi-aventis U.S. Inc. and is not a proper party to this action (Answer, p. 2); the entity named by Plaintiffs as Sanofi-Aventis U.S., LLP, is actually a limited liability company, sanofi-aventis U.S. LLC (*id.*, at 1); and some of the acts which Plaintiffs attribute to Defendants were actually committed by a related entity, Aventis Pharmaceutical, Inc. ("API") (*see id.*, ¶¶ 5, 14-16). For purposes of this memorandum and order, this Court will attribute acts and omissions on the part of one or more of these related entities to Defendants so as to avoid unnecessary complexity.

Sometime prior to March 2000, Defendants developed a prescription antibiotic, telithromycin, which was marketed under the brand name Ketek (Sec. Am. Complt., ¶ 10; Answer, ¶ 10). Early in 2000, Defendants submitted a New Drug Application ("NDA") to the Office of New Drugs at the United States Food and Drug Administration ("FDA"), seeking approval to sell Ketek in the United States (Sec. Am. Complt., ¶ 12; Answer, ¶ 12). That NDA sought to have Ketek approved for the treatment of four specific conditions or "indications": acute bacterial sinusitis ("ABS"), acute exacerbation of chronic bronchitis ("AECB"), community-acquired pneumonia ("CAP"), and tonsillopharyngitis (*id.*).

In June 2001, the FDA determined that it would not approve Ketek for treatment of tonsillopharyngitis and would only approve Ketek for the treatment of the other three indications if Defendants provided more evidence of Ketek's safety and efficacy (*Sergeants I,* 2011 WL 824607, at *1 (citing Plaintiffs' Proffer at 28)). To provide this evidence, Defendants commissioned a large clincal study known as "Study 3014" (Sec. Am. Complt., ¶ 14; Answer, ¶

3

14). Defendants hired Pharmaceutical Product Development, Inc. ("PPD"), a contract research organization, to monitor the study and contracted with another entity, The Copernicus Group, Inc. ("Copernicus"), to monitor patient safety (*Sergeants I*, 2011 WL 824607, at *2).

Early in the course of its evaluation, PPD raised concerns regarding the integrity of data collected by the office of Dr. Marie Anne Kirkman Campbell, a physician who treated the largest number of patients in the study (*Sergeants I*, 2011 WL 824607, at *2 (citing Plaintiffs' Proffer at 31)). Thereafter, the FDA's Office of Criminal Investigation ("the OCI") determined that there had been misconduct and protocol violations at several other sites with high patient enrollment (*id.* (citing Plaintiffs' Proffer at 38-39)). However, after the FDA again declined to approve Ketek and requested more information regarding Study 3014, Defendants issued a report that, Plaintiffs claim, not only omitted any mention of the study's problems but falsely represented that the study had been conducted in accordance with good clinical practice (*id.* (citing Sec. Am. Complt., ¶ 26)). According to Plaintiffs, Defendants also claimed Ketek's safety and efficacy profile matched that of other antibiotics, even though they (i) knew "that Study 3014 actually showed that Ketek was almost three times more likely to result in a possibly medication-related, serious adverse event; (ii) knew that Ketek was neither more efficacious nor as safe as widely available alternatives; and (iii) knew that claims that Ketek did better against antibiotic resistant pathogens were not scientifically supported" (*id.* (citing Plaintiffs' Memorandum In Support Of Class Certification at 3, nn. 10–14)).

In April 2004, after receiving Defendants' report, the FDA approved Ketek for three indications: ABS, AECB and CAP (Defendants' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment ("Defendants' 56.1"), ¶ 1; Plaintiffs' Response

4

to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Plaintiffs' 56.1"), ¶ 1). Immediately thereafter, Defendants launched a marketing campaign, seeking to have Ketek prescribed for "off-label" uses in addition to the three indications for which it was approved (*Sergeants I*, 2011 WL 824607, at *3). The parties agree that physicians are legally permitted to prescribe Ketek for an indication for which it was never approved, and that physicians frequently did so (Defendants' 56.1, ¶ 50; Plaintiffs' 56.1, ¶ 50).

That marketing campaign, which was aimed at physicians and other members of the healthcare community, initially proved successful. According to the Prior R&R, Ketek was prescribed over 3 million times in 2005 and had been prescribed over 6.1 million times by 2006 (*Sergeants I*, 2011 WL 824607, at *3). However, Ketek sales began to decline in January 2006 after the FDA released a public health advisory that warned physicians to monitor Ketek patients for potential liver problems (*id.*). In June 2006, after "[twenty-three] cases of acute severe liver injury and [twelve] cases of acute liver failure, [four] of them fatal, had been linked to Ketek," Defendants changed Ketek's label to include additional warnings, precautions, contraindications, and adverse reactions pursuant to FDA requirements and sent letters to healthcare professionals about these risks (*id.* (citing Plaintiffs' Proffer at 81) (brackets in *Sergeants I*)). In early February 2007, after Ketek had been "implicated in [fifty-three] cases of hepatotoxic effects" (*id.* (brackets in *Sergeants I*)), the FDA withdrew its approval for two indications: ABS and AECB (Defendants' 56.1, ¶ 3; Plaintiffs' 56.1, ¶ 3). Even though Ketek remained an FDA-approved drug for the treatment of CAP, Defendants thereafter ceased actively promoting Ketek in the United States (Defendants' 56.1, ¶¶ 4-5; Plaintiffs' 56.1, ¶¶ 4-5).

5

*The Plaintiffs Herein*

Plaintiffs are health benefit providers ("HBPs"), which provide health care benefits, including prescription drug benefits, to their members or beneficiaries. SBA, which has its principal place of business in New York, is a not-for-profit benefit fund, established and maintained to provide comprehensive health care benefits to active and retired sergeants of the New York City Police Department and their dependents (Sec. Am. Complt. at ¶ 2; Defendants' 56.1, ¶ 8; Plaintiffs' 56.1, ¶ 8). NEC has its principal place of business in Massachusetts and is an employee welfare benefit plan, as defined in section 3(1) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1) (Sec. Am. Complt. at ¶ 3; Defendants' 56.1, ¶ 9; Plaintiffs' 56.1, ¶ 9). ASD, which has its principal place of business in Illinois, is a multiemployer employee welfare benefit plan, within the meaning of section 3(37) of ERISA, 29 U.S.C. § 1002(37) (Sec. Am. Complt. at ¶ 4; Defendants' 56.1, ¶ 10; Plaintiffs' 56.1, ¶ 10).

Plaintiffs and other HBPs are also called third-party payors or "TPPs" because they pay certain medical costs on behalf of their members. However, the decision regarding what medications will be prescribed for Plaintiffs' members is made by the members' physicians. The parties agree that a variety of factors contribute to a physician's decision, including patient-specific factors and the physician's own experience with, and knowledge about, the various options (Defendants' 56.1, ¶¶ 38-41 ; Plaintiffs' 56.1, ¶¶ 38-41). Plaintiffs maintain that safety is "paramount" concern which impacts every prescription decision (Plaintiffs' 56.1, ¶¶ 38-41), but neither Plaintiffs nor Defendants maintain that safety is the sole determinant. Plaintiffs and Defendants agree that Ketek has competitors, some of which are more expensive than Ketek and some of which are lower-priced generics (Defendants' 56.1, ¶ 48; Plaintiffs' 56.1, ¶ 48). In

6

addition, the parties agree that those physicians who elect not to prescribe Ketek for AECB and ABS are likely to prescribe one of these competing antibiotics (Defendants' 56.1, ¶ 47; Plaintiffs' 56.1, ¶ 47).

The prescription drug benefits offered by Plaintiffs are administered by Pharmacy Benefit Managers ("PBMs"). In addition, at least one of the Plaintiffs—NEC—has delegated to a PBM the decision regarding what medications to include in the "formulary"—the list of drugs for which the TPP will pay (Defendants' 56.1, ¶ 13; Plaintiffs' 56.1, ¶ 13). PBMs typically use Pharmacy and Therapeutics ("P&T") Committees comprised of pharmacists, physicians and other healthcare professionals to determine what medications to include (Defendants' 56.1, ¶ 14; Plaintiffs' 56.1, ¶ 14). If a particular drug is prescribed for a plan's participant and is included in a plan's formulary, the HBP pays for that prescription in an amount determined by the formulary.

While Plaintiffs all included Ketek in their formularies at the time relevant to this action, not all Plaintiffs employed the same type of formulary or provided the same extent of coverage. Two of the three Plaintiffs in this case—NEC and ASD—employed a "three tiered formulary," in which a beneficiary's co-payment for a particular drug depends on the tier in which that drug is placed (Defendants' 56.1, ¶ 24; Plaintiffs' 56.1, ¶ 24). The first tier, in which co-payments are the lowest, typically includes generic drugs (Defendants' 56.1, ¶ 23; Plaintiffs' 56.1, ¶ 23). The second tier typically includes preferred brand-name drugs and the third tier includes non-preferred brand-name drugs (id.). The third Plaintiff, SBA, did not employ a tiered formulary (Defendants' 56.1, ¶ 25; Plaintiffs' 56.1, ¶ 25).

The degree to which Plaintiffs covered prescriptions for Ketek is unclear. The parties agree that, between 2002 and 2008, Sav-Rx provided formulary services to ASD (Defendants'

56.1, ¶ 26; Plaintiffs' 56.1, ¶ 26). However, the corporate representative provided by ASD during discovery did not know the tier in which Ketek appeared, or whether Ketek had been moved from one tier to another during the time in which Sav-Rx served as PBM (Defendants' 56.1, ¶ 27; Plaintiffs' 56.1, ¶ 27). ASD switched to another PBM in 2008, which listed Ketek in Tier 2 as of March 2010 (Defendants' 56.1, ¶¶ 28-29; Plaintiffs' 56.1, ¶¶ 28-29).

NEC has employed at least two different PBMs since June 1, 2004 (Defendants' 56.1, ¶ 31; Plaintiffs' 56.1, ¶ 31). Although Ketek has always remained a covered drug under NEC's plan, it was apparently moved to Tier 3—the tier with the highest co-payment—at some point in December 2006 (Defendants' 56.1, ¶ 32; Plaintiffs' 56.1, ¶ 32).

In contrast, the parties agree that SBA's coverage of Ketek has remained the same since the drug was approved by the FDA in 2005 (Defendants' 56.1, ¶ 30; Plaintiffs' 56.1, ¶ 30). However, the parties disagree about the degree of coverage. Defendants maintain that SBA's formulary covered all FDA-approved drugs and did not distinguish between preferred, non-preferred and generic drugs (Defendants' 56.1, ¶ 25). In contrast, Plaintiffs maintain that, at all relevant times, SBA employed a "mandatory generic program" to "promote the use of cost-effective generic alternatives" (Plaintiffs' 56.1, ¶ 25). However, SBA did not cease paying for brand-name drugs that have a generic equivalent until January 1, 2009 (*Id.*).

## The Instant Action

The three Plaintiffs and Louisiana Attorney General Charles C. Foti, Jr.—acting in his official capacity and on behalf of, *inter alia*, the Louisiana Department of Health and Hospitals—commenced this action against Defendants on January 14, 2008. The original complaint sought to bring a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of "a

class of consumers and third-party payors that have paid or incurred costs for . . . Ketex"
(Complaint at ¶ 2). In an amended complaint filed approximately two weeks later, the proposed
class was amended to omit "consumers." The amended complaint identified the class that
Plaintiffs sought to represent as "consisting of all health insurance companies, third-party
administrators, health maintenance organizations, self-funded health and welfare benefit plans,
third-party payors and any other health benefit provider, including governmental entities, which
paid or incurred costs for . . . Ketex" (Am. Complt., ¶ 1).

The original complaint and the amended complaint both alleged that this Court had
subject-matter pursuant to 28 U.S.C. § 1332(d)(2), which provides for original jurisdiction over
class actions in which the matter in controversy exceeds $5 million and "any member of a class
of plaintiffs is a citizen of a State different from any defendant" (Complt., ¶ 9; Am. Complt. at
¶ 9). The amended complaint raised only two causes of action or "counts," both of which were
based on violations of state law. The first cause of action alleged that Defendants engaged in
unfair competition or unfair or deceptive acts or practices in violation of various state consumer
protection statutes, including laws of New York, Massachusetts and Illinois—the States in which
Plaintiffs are based. The second cause of action alleged unjust enrichment.

On May 21, 2008, Attorney General Foti filed a notice of voluntary dismissal, dismissing
the Louisiana plaintiffs' claims against Defendants without prejudice. About two weeks later,
Plaintiffs filed a Second Amended Complaint. That pleading not only deleted all references to
the Louisiana defendants but also added two RICO claims: one count alleging a substantive
violation of 18 U.S.C. § 1962(c), and a second count alleging a RICO conspiracy in violation of
18 U.S.C. § 1962(d).

The substantive RICO claim alleges that the "association-in-fact" between Defendants, PPD, and Copernicus constituted a criminal enterprise, which Plaintiffs dub the "study 3014 Enterprise." According to Plaintiffs, the members of the criminal enterprise had "a common purpose—to enable Sanofi-Aventis to fraudulently represent that Ketek had valid regulatory approval for broad antibiotic uses" (Sec. Am. Complt., ¶ 74). To that end, they participated in a criminal scheme "calculated to ensure that Ketek was approved, and approved for as many indications as possible, despite the lack of adequate safety studies, the lack of superior efficacy and inferior safety profile compared to other safer, less expensive antibiotics already sold in the U.S. market" (*Id.* at ¶ 80). In furtherance of the scheme, Defendants allegedly "conducted and participated in the affairs of the study 3014 Enterprise through patterns of racketeering activity," including "acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1512 (tampering with witnesses), and § 1952 (use of interstate facilities to conduct unlawful activity)" (Sec. Am. Complt., ¶ 77) (parentheses in original).

The RICO conspiracy claim alleges that the Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c) in the manner described above. According to the Second Amended Complaint, the "object of this conspiracy was and is to conduct or participate in, directly or indirectly, the conduct of affairs of the study 3014 Enterprise . . . through a pattern of racketeering activity" (Sec. Am. Complt., ¶ 88). In furtherance of the conspiracy, Defendants allegedly committed numerous overt acts, including "(a) [m]ultiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342; (b) [m]ultiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346; (c) [m]ultiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and (d) [m]ultiple instances of unlawful activity in violation of 18 U.S.C. § 1952 (Sec. Am. Complt., ¶ 92) (parentheses and brackets added).

In May 2010, Plaintiffs moved to certify a class including all TPPs which paid or incurred costs for Ketek between April 1, 2004, and February 12, 2007. This Court referred the motion to Judge Reyes for a report and recommendation. On February 16, 2011, Judge Reyes issued the Prior R&R—*Sergeants I*—recommending that class certification be denied because Plaintiffs could not establish through generalized proof that Defendants' alleged RICO violations caused Plaintiffs' alleged injuries. In reaching that determination, Judge Reyes principally relied *on UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010) ("*Zyprexa*")—a case which had been decided approximately six months before Judge Reyes issued his Prior R&R.

Plaintiffs timely objected to portions of the Prior R&R. However, in a memorandum and order dated March 30, 2011—*Sergeants II*—this Court concluded that those objections were without merit and adopted the Prior R&R in its entirety. Plaintiffs then petitioned the Second Circuit Court of Appeals for leave to appeal this Court's order on class certification, but that petition was denied on July 28, 2011, on the ground that immediate appeal was unwarranted.

### *Defendants' Motion for Summary Judgment*

On December 22, 2011, Defendants moved for summary judgment with respect to all four causes of action or "counts" listed in the Second Amended Complaint. Defendants' motion essentially consists of two parts, which are discussed separately and in some detail in the Discussion section below. First, Defendants argue that the RICO claims set forth in Counts I and II fail as a matter of law because Plaintiffs cannot prove causation under RICO and cannot establish that they themselves suffered any injury as result of the alleged RICO violations. Second, Defendants argue that Plaintiffs' state-law claims fail as a matter of law because Plaintiffs cannot prove a violation of any of the state consumer protections statutes listed in

11

Count III of the Second Amended Complaint and cannot make out unjust enrichment under New York, Massachusetts or Illinois law.

On January 4, 2012, the Court referred Defendants' motion for summary judgment to Judge Reyes for a report and recommendation. On September 17, 2012, Judge Reyes issued the R&R—*Sergeants III*—in which he recommends that Defendants' motion be granted in its entirety. On October 4, 2012, Plaintiffs collectively filed objections to the R&R, specifically addressing almost every portion of the R&R. Judge Reyes' recommendations with respect to each portion of Defendants' motion and Plaintiffs' objections thereto are discussed below.

## DISCUSSION

### I. Standards of Review

In reviewing a plaintiff's objection to a report and recommendation issued by a magistrate judge, the district court applies the standard of review set forth in 28 U.S.C. § 636(b)(1) and Rule 72(b)(3) of the Federal Rules of Civil Procedure. Under both provisions, a district court is to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *accord* Fed. R. Civ. P. 72(b)(3). Upon de novo review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). A district court, however, is not required to review the factual or legal conclusions of the magistrate judge as to those portions of a report and recommendation to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).

In conducting de novo review of those portions of the R&R which recommend granting summary judgment, this Court is mindful that summary judgment is appropriate only when

"there is no genuine issue as to any material fact and the movant party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation marks omitted; brackets added).

The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990); *see* Fed. R. Civ. P. 56(e). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted). Moreover, the disputed facts must be material to the issue in the case, in that they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

When evaluating a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could

not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (quoting *Liberty Lobby*, 477 U.S. at 249-50) (brackets in Scotto).

## II. The RICO Claims

### A. Defendants' Motion for Summary Judgment on Counts I and II

In the first portion of their motion for summary judgment, Defendants focus primarily on causation, one of the elements of a RICO claim. Defendants note that, in order to prove this element, Plaintiffs must prove that the predicate acts underlying the RICO violations alleged in Counts I and II of the Second Amended Complaint were both the but-for cause and proximate cause of an injury to Plaintiffs. Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Defendants" Memo") at 9. Citing to *Zyprexa*, Defendants argue that Plaintiffs cannot prove but-for causation through generalized proof, since the individual physicians' decisions to prescribe Ketek for Plaintiffs' beneficiaries were based on many factors and not solely on Plaintiffs' exaggerated claims regarding Ketek's safety and efficacy. *Id.* at 10. Defendants maintain that "for each Ketek prescription that allegedly caused Plaintiffs injury," Plaintiffs have to prove that the "physician would not have prescribed Ketek but for the Defendants' alleged fraud." *Id.* at 11.

In addition, Defendants argue that Plaintiffs cannot establish proximate causation through generalized proof. Defendants note that a member's physician's decision to prescribe Ketek would not result in injury to a Plaintiff unless Ketek was included in that Plaintiffs' formulary. *Id.* at 12. Defendants assert that "to prove RICO causation, Plaintiffs must . . . prove that

14

Defendants' alleged fraud caused the P&T Committees to approve the use and reimbursement of Ketek in a manner that was different from what would have occurred absent Defendants' alleged fraud" and "prove that the P&T Committees' decisions that were based on Defendants['] alleged fraud actually resulted in Plaintiffs paying for more Ketek prescriptions than they otherwise would have." *Id.* at 12-13. Defendants then argue that there is no evidence to prove that Plaintiffs' PBMs relied on Defendants' alleged fraud in making formulary decisions regarding Ketek and that generalized proof on this issue will not suffice. *Id.* at 13-15.

Finally, Defendants contend that Plaintiffs cannot establish that they were injured as a result of the RICO violations unless "they can prove that they made a prescription drug payment that they would not have made absent Defendants' alleged fraud." *Id.* at 17. Defendants note that "[i]t is undisputed that, had physicians not prescribed Ketek for AECB and ABS, they likely would have prescribed some other antibiotic," *id.*, and that "Plaintiffs admit that several of the alternative[s] . . . were more expensive than Ketek." *Id.* at 18. Again relying on *Zyprexa*, Defendants assert that Plaintiffs cannot prove by common evidence what antibiotic would have been prescribed in lieu of Ketek. Defendants note that Plaintiffs do not offer any individualized proof, but instead assume that "*every* prescription for a non-CAP indication caused the class members injury in an amount equal to the amounts they paid for the Ketek prescriptions." *Id.* (emphasis in original).

### B. Plaintiffs' Opposition

In their Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Opposition"), Plaintiffs acknowledge that, in order to establish RICO causation, Plaintiffs must establish a "sufficiently direct" relationship between Defendants' alleged RICO violations and

15

Plaintiffs' alleged injury. Plaintiffs' Opposition at 10. However, Plaintiffs maintain that, despite the presence of other factors in the causal chain, a sufficiently direct relationship may exist "so long as the plaintiff's injury was 'a foreseeable and natural consequence of' the defendant's misconduct." *Id.* (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008)). Plaintiffs emphasize that *Bridge* and other Supreme Court cases establish that plaintiffs need not prove that they themselves relied on Defendants' misrepresentations in order to make out RICO causation. *Id.* at 11.

Plaintiffs assert that *Zyprexa*—the Second Circuit case on which Defendants rely and on which Judge Reyes relied in recommending that this Court deny Plaintiffs' motion for class certification—was incorrectly decided. Specifically, Plaintiffs assert that the Second Circuit "misreads" *Hemi Group LLC v. City of New York*, 559 U.S. 1 (2010)—the most recent of the Supreme Court's four opinions on RICO causation—in holding that a physician's prescribing decision interrupted the causal chain between a pharmaceutical company's misrepresentations and a TPPs injuries. Plaintiffs' Opposition at 14. Plaintiffs read *Zyprexa* as holding that "independent actions" of third or fourth parties render the relationship between the company's wrongdoing and the TPPs' injuries insufficiently direct, and assert that *Hemi Group* held only that "there is no proximate cause when those non-party actions are 'independent' of the RICO scheme." Plaintiffs' Opposition at 14. Plaintiffs assert that this case is analogous to *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), and *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011)—cases in which courts found RICO causation under facts which, Plaintiffs assert, are similar to the facts herein. Plaintiffs' Opposition at 15.

Plaintiffs concede that physicians may consider individual factors in determining what medication to prescribe, but argue safety considerations lie at the "heart of every prescription decision." Plaintiffs' Opposition at 17. Plaintiffs reason that Defendants' "omission of critical health risk information necessarily affected, and was a substantial contributing factor for, every prescription decision by a physician as well as Plaintiffs' coverage and payment decisions." *Id.* at 18. Plaintiffs do not specifically address Defendants' claims that Plaintiffs have failed to prove that Defendants' alleged misconduct affected the PBMs' decision making, arguing that "[w]here Ketek existed on Plaintiffs' formularies is irrelevant." *Id.* at 16 (brackets added). Plaintiffs argue that what is relevant is that "Plaintiffs paid for Ketek prescriptions that would not have been written but for [Defendants'] fraud." *Id.* (brackets added). In support of the latter proposition, Plaintiffs cite to testimony from their expert, Dr. Meredith Rosenthal, for the proposition that "the most important factor [is] that [Ketek] went from a blockbuster drug within eighteen months to virtually zero." *Id.* at 17 (brackets in original). Plaintiffs note that their own experiences also support this proposition, noting that SBA paid for nearly 1,000 Ketek prescriptions between 2004 and the end of 2006, 24 prescriptions in 2007, and no prescriptions at all in 2008. *Id.*

### C. Judge Reyes' Recommendations

In his R&R, Judge Reyes concludes that "Plaintiffs' RICO claims fail as a matter of law" because Plaintiffs cannot establish causation, an essential element of such claims. *Sergeants III*, 2012 WL 4336218, at *4. Quoting *Zyprexa*, Judge Reyes notes that in order to make out a RICO claim, a plaintiff must establish, *inter alia*, that the RICO violation was the proximate cause of plaintiff's injury. In the Civil RICO context, proximate causation requires a "direct relationship

17

between the plaintiff's injury and the defendant's injurious conduct." *Id.* at *3 (quoting *Zyprexa*, 620 F.3d at 132). However, Judge Reyes holds that, in this case as in *Zyprexa*, "'the independent actions of prescribing physicians' interrupt the causal relationship between the predicate act and Plaintiffs' harm, thereby 'thwart[ing] any attempt to show proximate cause through generalized proof.'" *Id.* (quoting *Zyprexa*, 620 F.3d at 135) (brackets in *Sergeants III*). Construing *Zyprexa* as "recogniz[ing] that prescribing decisions are based, to varying degrees, on factors independent of the alleged misrepresentation," *id.* at *4, Judge Reyes concludes that individualized proof is required to show proximate cause under RICO and that "Plaintiffs' generalized proof is insufficient." *Id.*

The R&R specifically addresses some of Plaintiffs' arguments in opposition to summary judgment. First, Judge Reyes rejects Plaintiffs' contention that "a party who suffers an injury that is a 'foreseeable and natural result' of a defendant's conduct may satisfy RICO causation even where intervening factors are present." *Id.* at *3. Judge Reyes notes that the Supreme Court has emphasized that "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm," rather than on foreseeability. *Id.* (quoting *Hemi Group*, 559 U.S. at 12). Second, Judge Reyes responds to Plaintiffs' assertion that *Zyprexa* "misreads" the Supreme Court's decision in *Hemi Group* by noting that "district courts are bound 'to follow controlling precedents of the courts of appeals for their circuits.'" *Id.* (quoting *Jackson v. Good Shepherd Servs.*, 683 F. Supp. 2d 290, 292 (S.D.N.Y. 2009)). Third, in response to Plaintiffs' argument that "Defendants' alleged omission of critical health information necessarily affected every physician's prescribing decision because physicians always consider safety in making treatment decisions," *id.* at *4, the magistrate judge notes that "[a]lthough safety may be a

fundamental consideration in a physician's prescription decision," the Second Circuit has recognized that "physicians . . . make prescribing decisions based on a multitude of factors," and "that prescribing decisions are based, to varying degrees, on factors independent of the alleged misrepresentation." *Id.*

### D. Plaintiffs' Objections

Plaintiffs object to Judge Reyes' recommendation that their RICO claims be dismissed, relying on *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), for the proposition that RICO's proximate causation requirement can be "satisfied where the plaintiff's injury was a foreseeable and natural result of the defendant's conduct, even where other actors served as links in the causal chain." Plaintiffs' Objections to the Sept. 17, 2012, Report & Recommendation ("Objections") at 7. Asserting that this case "parallels *BCS Services*"—a Seventh Circuit case which the Second Circuit has allegedly cited with approval—Plaintiffs argue that *BCS Services* implies that the intervening acts of third parties do not necessarily "break the chain of causation" when a "plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct." *Id.* at 10-11. Plaintiffs distinguish *Hemi Group*, noting that the plaintiff's injury in that case was "unrelated to the defendant's fraud." *Id.* at 12.

Plaintiffs also assert that "[n]either RICO nor any rule of civil procedure or evidence bars the use of aggregate evidence" in this case. *Id.* at 13. Plaintiffs assert that Defendants' "omission of critical safety information about Ketek's serious liver risks affected *all* doctors and *all* Ketek prescription decisions for sinusitis and bronchitis indications at issue," claiming that prescriptions for those two indications "*completely* disappeared" once the liver risks were

19

disclosed. *Id.* at 14 (emphasis in original). Plaintiffs further assert that the R&R implies that "the only way to show marketing fraud . . . is to drag each and every doctor into court to talk about each and every prescription decision he or she made to determine whether [Defendants'] omission of critical safety information had any effect on each decision . . . ," *id.*, and that this would be practically impossible.

### E. Discussion

The RICO claims set forth in Plaintiffs' first two causes of action are brought pursuant to 18 U.S.C. § 1964(c), which provides a private right of action to "[a]ny person injured in his business or property by reason of a violation of [Title 18,] section 1962" of the United States Code. The first cause of action alleges that Defendants violated the 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with" an enterprise engaged in or affecting interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." The second cause of action alleges that Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c) in the manner described above.

The Supreme Court has recognized that language of § 1964(c) "can . . . be read to mean that a plaintiff is injured 'by reason of' a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265-66 (1992). However, in *Holmes*, the Supreme Court expressly declined to give the language "such an expansive reading," finding it very unlikely that "Congress meant to allow all factually injured plaintiffs to recover." *Id.* at 266. Rather, the *Holmes* Court—like

many Circuit Courts of Appeals that had previously considered the issue, *id.* at n.11 (citing, *inter alia, Sperber v. Boesky*, 849 F.2d 60 (2d Cir. 1988))—held that not mere factual, but proximate, causation is required. *Id.* at 268.

The *Holmes* Court "use[d] 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Id.* at 268. Thus, "[p]roximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations . . . ." *Hemi Group*, 559 U.S. at 9. However, "RICO causation is a concept distinct from 'proximate causation as that term is used at common law.'" *McBrearty v. Vanguard Group, Inc.*, 353 Fed. Appx. 640, 642 n. 1 (2d Cir. 2009) (summary order) (quoting *Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 (2d Cir. 1996)). "The concepts of direct relationship and foreseeability are . . . two of the 'many shapes [proximate cause] took at common law,'" *Hemi Group*, 559 U.S. at 12 (quoting *Holmes*, 503 U.S. at 268) (brackets in *Hemi Group*), and "foreseeability is often the test of proximate causation at common law." *McBrearty*, 353 Fed. Appx. at 642 n. 1 (citing *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 100 (1928)). However, forseeability is not the focus of the proximate cause determination in RICO cases. Rather, "the focus is on the directness of the relationship between the conduct and the harm." *Hemi Group*, 559 U.S. at 12. In analyzing whether there is proximate cause in the RICO context, the Supreme Court has placed "particular emphasis on the 'demand for some direct relation between the injury asserted and the injurious conduct alleged,'" *Bridge*, 553 U.S. at 654 (quoting *Holmes*, 503 U.S. at 268), stating that "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

There are three rationales for this emphasis on a direct relationship between the defendant's wrongdoing and the plaintiffs' injury. As the Supreme Court has explained:

> The direct-relation requirement avoids the difficulties associated with attempting "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors," *Holmes*, 503 U.S., at 269 . . . ; prevents courts from having "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries," *ibid.*; and recognizes the fact that "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely," *id.*, at 269-270 . . . .

*Bridge*, 553 U.S. at 654-55.

Because "[p]roximate cause . . . is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case," *id.* at 654 (internal quotations and citations omitted) (brackets and ellipses added), there is no precise standard that can be used to determine whether RICO causation exists. However, the Supreme Court has decided four cases over the last 22 years which have directly addressed the issue. In the last of those four cases—the 2010 decision in *Hemi Group*—the Supreme Court reviewed the three prior cases and extracted some basic principles relating to RICO causation.

Writing for a four-justice plurality in *Hemi Group*, Chief Justice Roberts first discussed *Holmes*, the 1992 case which first enunciated the RICO causation standard. In *Holmes*, the Securities Investor Protection Corporation ("SIPC"), a private nonprofit corporation which has a duty to reimburse customers of certain registered broker-dealers in the event that the broker-dealers are unable to meet their financial obligations, brought a RICO claim against 75 defendants who had allegedly conspired to manipulate stock prices. When the conspiracy was

22

detected, stock prices declined, rendering the broker-dealers unable to meet their obligations and leaving SIPC to reimburse the broker-dealers' customers.

The *Holmes* Court held that SIPC could not recover against the conspirators under RICO because it could not establish that it was injured "by reason of" the alleged fraud as required by 18 U.S.C. §1964(c). After holding that proximate causation required "some direct relation between the injury asserted and the injurious conduct alleged," 503 U.S. at 268, the *Holmes* Court held that the connection between the alleged conspiracy and SIPC's injury was "too remote" to satisfy RICO's direct relationship requirement. *Id.*, at 271. The Court stated:

> [T]he link is too remote between the stock manipulation alleged and the [broker-dealers'] customers' harm, being purely contingent on the harm suffered by the broker-dealers. That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims. Although the customers' claims are senior (in recourse to "customer property") to those of the broker-dealers' general creditors, the causes of their respective injuries are the same: The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors.

*Id.* (internal citation omitted; bracketed material added). After laying out these multiple steps between the alleged wrongdoing and the plaintiff's injury, the *Holmes* Court noted that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step," and that this general tendency also applied to proximate cause inquiries under RICO. *Id.* at 271-72 (internal quotations and citations omitted).

The *Hemi Group* plurality next examined *Anza*, a 2006 decision which addressed a RICO claim brought by the Ideal Steel Supply Corporation ("Ideal") against a competing entity,

National Steel Supply, Inc., and its principals, Joseph and Vincent Anza (collectively, "National"). Ideal claimed that National had defrauded New York State by failing to charge and remit sales taxes, enabling National to undercut Ideal's prices and, thereby, to attract customers at Ideal's expense. Although the district court granted National's motion to dismiss, the Second Circuit reversed, holding that "where a complaint alleges a pattern of racketeering activity 'that was intended to and did give the defendant a competitive advantage over the plaintiff, the complaint adequately pleads proximate cause, and the plaintiff has standing to pursue a civil RICO claim.'" *Anza*, 547 U.S. at 455 (quoting *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 263 (2d Cir. 2004)).

The Supreme Court reversed the Second Circuit, finding the link between the tax fraud allegedly perpetrated upon the State of New York and the injury suffered by Ideal to be "attenuated." *Id.*, at 459. As Chief Justice Roberts explained in *Hemi Group*, *Anza*:

> recognized that Ideal had asserted "its own harms when [National] failed to charge customers for the applicable sales tax." But the cause of Ideal's harm was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." The alleged violation therefore had not "led directly to the plaintiff's injuries," and Ideal accordingly had failed to meet RICO's "requirement of a direct causal connection" between the predicate offense and the alleged harm.

*Hemi Group*, 559 U.S. at 10-11 (internal citations omitted, brackets and parentheses in original).

In deciding *Hemi Group*, Chief Justice Roberts compared the facts in that case to the facts in *Holmes* and *Anza*. In *Hemi Group*, the City of New York, which taxes the possession of cigarettes, brought a RICO action against Hemi Group, a New Mexico entity which sells cigarettes online, seeking to recover amounts lost in unrecovered tax revenues. While New York State and City laws did not require Hemi Group to charge, collect, or remit the tax, a federal

24

law—the Jenkins Act—required Hemi Group to provide customer information to the states into which their cigarettes were shipped. Pursuant to an agreement between New York State and New York City, the State would forward the Jenkins Act information to the City, enabling the latter to take action to collect taxes from the online purchasers.

In analyzing the City's causal theory in *Hemi Group*, Chief Justice Roberts found it "far more attenuated than the one . . . rejected in *Holmes*." 559 U.S. at 9. The Chief Justice noted that the City's theory involved multiple steps, stating:

> According to the City, Hemi committed fraud by selling cigarettes to city residents and failing to submit the required customer information to the State. Without the reports from Hemi, the State could not pass on the information to the City, even if it had been so inclined. Some of the customers legally obligated to pay the cigarette tax to the City failed to do so. Because the City did not receive the customer information, the City could not determine which customers had failed to pay the tax. The City thus could not pursue those customers for payment. The City thereby was injured in the amount of the portion of back taxes that were never collected.

*Id.* After citing *Holmes* for the proposition that the "general tendency . . . not to go beyond the first step" "applies with full force to proximate cause inquiries under RICO," Chief Justice Roberts concluded, "Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement." *Id.* at 10.

Chief Justice Roberts then compared the facts of *Hemi Group* to *Anza*, and concluded:

> The City's claim suffers from the same defect as the claim in *Anza*. Here, the conduct directly responsible for the City's harm was the customers' failure to pay their taxes. And the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports. Thus, as in *Anza*, the conduct directly causing the harm was distinct from the conduct giving rise to the fraud.

*Id.* at 11 (internal citation omitted).

At the end of his opinion, the Chief Justice distinguished the Supreme Court's 2008 decision in *Bridge*—a case involving competing bidders at a county tax-lien auction. In those auctions, liens on real property were awarded based on how small a tax penalty the bidder was willing to accept from property owners. Since multiple bidders routinely offered not to charge any tax penalty, the county allocated the liens between such bidders on a rotating basis. Recognizing that bidders who employed agents to bid on their behalf could obtain a disproportionate share of the liens, the county adopted a "Single, Simultaneous Bidder Rule," requiring each bidder to submit bids in its own name and prohibited bidders from using agents to submit simultaneous bids for the same parcel.

In *Bridge*, one regular participant in the auctions, Phoenix Bond and Indemnity Co. ("Phoenix"), brought RICO claims against another participant, alleging a violation of the Single, Simultaneous Bidder Rule. Although Phoenix alleged that its competitor had defrauded the county, and not Phoenix, the Supreme Court held that Phoenix had met RICO's causation requirement. As Chief Justice Roberts explained in his opinion in *Hemi Group*:

> [T]he plaintiff's theory of causation in *Bridge* was "straightforward": Because of the zero-sum nature of the auction, and because the county awarded bids on a rotational basis, each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over. The losing bidders, moreover, were the only parties injured by petitioners' misrepresentations. The county was not; it received the same revenue regardless of which bidder prevailed.

559 U.S. at 14-15 (internal quotations and citations omitted; brackets added). The Chief Justice then contrasted the facts in *Hemi Group* to those in *Bridge*, stating:

> The City's theory in this case is anything but straightforward: Multiple steps . . . separate the alleged fraud from the asserted

26

> injury. And in contrast to *Bridge*, where there were "no
> independent factors that account[ed] for [the plaintiffs'] injury,"
> here there certainly were: The City's theory of liability rests on the
> independent actions of third and even fourth parties.

*Id.* at 15 (internal citation omitted) (brackets in original).

In their Objections to that portion of the R&R which recommends granting Defendants summary judgment dismissing Plaintiffs' civil RICO claims, Plaintiffs principally rely on *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011)—a case arising from the same exact facts as *Bridge*. In *Bridge*, the Supreme Court affirmed a Seventh Circuit opinion authored by Judge Posner: *Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928 (7th Cir. 2007). On remand, the district court granted summary judgment to the defendants on the ground that the plaintiffs could not prove that the fraud was a "proximate cause" of their alleged losses. The plaintiffs then appealed to the Seventh Circuit, which consolidated the case with *BCS Services*, a case which the Seventh Circuit deemed "materially identical" to *Bridge*. 637 F.3d at 751.

Although *BCS Services* involves the same facts as *Bridge*, the Supreme Court made a critical assumption in *Bridge*: that the county auctioneers had awarded the tax liens in cases in which multiple bidders tied for lowest bidder on a "rotational basis." *Bridge*, 553 U.S. at 643. As Judge Posner clarified in his opinion in *BSC Services*, that assumption was incorrect. In fact, auctioneers attempted to award the bids to the low bidder who raised his or her hand first. *BCS Services*, 637 F.3d at 752. However, while the awards were not made on a "strict rotational basis," they could nonetheless be characterized as "the random product of guesswork." *Id.* at 753.

Although the facts in this case are quite different from the facts in *BCS Services* and *Bridge*, Plaintiffs argue that '[t]he instant case parallels *BCS Services*." Objections at 11. In

advancing this argument, Plaintiffs make much of the factual distinction between *BCS Services* and *Bridge*, arguing:

> *BCS Services* involved the actions of independent third parties—auctioneers—whose decisions ultimately determined whether the plaintiffs would be harmed or not: whether they would win the tax liens on which they bid. The presence of these third parties did not disrupt the forseeability or directness of the injury to the plaintiffs . . . ."

Objections at 11.

The three-judge panel which decided *BCS Services*, however, viewed the factual distinction between that case and *Bridge* as essentially insignificant. In his opinion on behalf of the unanimous panel, Judge Posner found the relationship between the defendants' wrongdoing and the plaintiffs' injuries direct enough to satisfy the proximate cause requirement. *See BCS Services*, 637 F.3d at 756. Although the defendants violated the county's rule limiting related entities to a single bidding agent, that rule "was intended for the benefit of unrelated bidders," rather than for the benefits of the county itself, which received the same amount of money regardless of who won the auction. *Id.* Accordingly, the defendants' law-abiding fellow bidders were both the intended and only victims of the RICO violation.

While the Seventh Circuit recognized that the auctioneers decisions were intervening acts in the chain of causation, it tacitly concluded that these random decisions, over time, would produce roughly the same result as awarding bids on a strictly rotational basis. The Seventh Circuit noted:

> The only intermediate cause and effect pair was the raising of hands (cause) and the auctioneer's determination of the winning bid (effect), and this pair doesn't weaken the inference that by having more hands in the air the defendants stole tax liens from the

> other bidders. That would be obvious if the auctioneers awarded
> tax liens in identical-bid cases on a strictly rotational basis, as the
> Supreme Court assumed when, in its opinion affirming our
> previous decision, it characterized the plaintiffs' theory of
> causation as "straightforward." 553 U.S. at 647, 128 S. Ct. 2131;
> *see also Hemi Group* . . . . Straightforward it was and after
> discovery straightforward it remains because . . . random awards
> . . . are similar to awards made on a strictly rotational basis.

*BCS Services*, 637 F.3d at 757. In other words, although an individual decision by an auctioneer

might be unpredictable (like a single coin flip), the auctioneers' random decisions over time

could be expected to result in an equal distribution across all bidders (just as a long series of coin

flips can be expected to average 50% heads, 50% tails). Since the intervening acts of the

auctioneers were, in the aggregate, as predictable as a strict rotation, the effect of the misconduct

on the honest bidders remained calculable. *See Hemi Group*, 559 U.S. at 14 (implying that the

injury to the honest bidders in *Bridge* (and *BCS Services*) was calculable "[b]ecause of the

zero-sum nature of the auction, and because the county awarded bids on a rotational basis, each

time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed

over").

In this case, in contrast, the intervening acts which interrupt the causal chain between

Defendants' RICO violations and Plaintiffs' injuries cannot be readily predicted. Very broadly

stated, Defendants in this case allegedly violated RICO by fraudulently exaggerating the safety

and efficacy of a prescription antibiotic in order to boost sales and revenues. However,

Defendants' alleged misconduct would not result in injury to Plaintiffs unless doctors relied on

the fraudulent information in prescribing the antibiotic to patients insured by Plaintiffs. As

recognized by the Second Circuit in *Zyprexa*—the case on which Judge Reyes relied in his

R&R—the prescribing decisions of physicians are based on so many factors as to defy any efforts to categorically attribute them to a particular cause.

In *Zyprexa*, as here, TPPs sued a pharmaceutical company, Eli Lilly & Company ("Lilly"), alleging that the company exaggerated the efficacy and safety of a prescription medication, Zyprexa, in the course of promoting off-label uses of the medication. The TPPs moved to certify a class of TPPs that had paid for Zyprexa prescriptions, arguing that these class members had been injured (1) "by paying for Zyprexa prescriptions that would not have been issued but for the alleged misrepresentations" (the "Quantity Effect Theory") and (2) "by paying a higher price for Zyprexa than would have been charged absent the alleged misrepresentations" (the "Excess Price Theory"). *Zyprexa*, 620 F.3d at 123. Lilly cross-moved for summary judgment. The district court, believing that the case, "[b]oiled down," presented "an overpricing claim," denied the motion for summary judgment, *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571, 576 (E.D.N.Y. 2007), and certified a class of TPPs under the Price Effect Theory. *In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69 (E.D.N.Y. 2008).

Both of the district court's decisions were appealed to the Second Circuit, which addressed both appeals simultaneously in *Zyprexa*. That opinion began by addressing the class certification issue, noting that the parties agreed that the requirements of Federal Rule of Civil Procedure 23(a) were satisfied but disagreed as to whether questions of law or fact common to class members predominated over any questions affecting only individual members. *Zyprexa*, 620 F.3d at 131. After observing that "[c]lass-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the

30

issues subject only to individualized proof," *id.* (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002), the Second Circuit proceeded to consider whether "substantial elements" of the civil RICO claim against Eli Lilly could be "established by generalized, rather than individualized, proof." *Id.*

The Second Circuit first addressed the Excess Price Theory and determined that neither but-for causation nor proximate causation could be established through generalized proof. First, the Court held that since "doctors do not generally consider the price of a medication when deciding what to prescribe . . .[,] reliance by doctors on misrepresentations as to the efficacy and side effects of a drug . . . was not a but-for cause of the price that TPPs ultimately paid for each prescription." *Id.* at 133-34. Second, the Court held that the multiple step causal chain and the "independent actions of third and even fourth parties" precluded using generalized proof to establish proximate causation. *Id.* at 134. The Second Circuit stated:

> [I]f plaintiffs' factual allegations are correct, the chain of causation runs as follows: Lilly distributes misinformation about Zyprexa, physicians rely upon the misinformation and prescribe Zyprexa, TPPs relying on the advice of PBMs and their Pharmacy and Therapeutics Committees place Zyprexa on their formularies as approved drugs, TPPs fail to negotiate the price of Zyprexa below the level set by Lilly, and TPPs overpay for Zyprexa. Thus, in this case "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Hemi Group*, 130 S. Ct. at 990. Plaintiffs' "theory of liability rests on the independent actions of third and even fourth parties," *id.* at 992, as physicians, PBMs, and PBM Pharmacy and Therapeutics Committees all play a role in the chain between Lilly and TPPs.

*Id.*

The Second Circuit then turned to the Quantity Effect Theory, holding that causation could not be established by generalized proof under that theory, either. The Court noted that the

chain of causation was "simpler" under the Quantity Effect Theory than under the Excess Price

Theory, comprising only four steps:

> TPPs place Zyprexa on their formularies as approved drugs, Lilly
> distributes misinformation about Zyprexa, physicians rely upon the
> misinformation and prescribe Zyprexa, and TPPs pay for too many
> Zyprexa prescriptions.

*Id.* at 135. However, the Court noted that the third step involved an intervening act—the writing

of prescriptions—which interrupted the causal chain, stating:

> The nature of prescriptions . . . means that this theory of causation
> is interrupted by the independent actions of prescribing physicians,
> which thwarts any attempt to show proximate cause through
> generalized proof. Plaintiffs argue that "the ultimate source for the
> information on which doctors based their prescribing decisions was
> Lilly and its consistent, pervasive marketing plan." Lilly was not,
> however, the only source of information on which doctors based
> prescribing decisions. An individual patient's diagnosis, past and
> current medications being taken by the patient, the physician's own
> experience with prescribing Zyprexa, and the physician's
> knowledge regarding the side effects of Zyprexa are all
> considerations that would have been taken into account in addition
> to the alleged misrepresentations distributed by Lilly.

*Id.*

In addition, the Court noted that the plaintiffs could not show injury by generalized proof.

The plaintiffs' expert, Dr. Harris, assumed, *inter alia*, that Zyprexa sales would never have risen

above the levels which existed after more accurate information about Zyprexa's side effects

became public and that all prescriptions above that level constituted "excess" prescriptions, for

which the plaintiffs were entitled to recover. However, the Second Circuit rejected the expert's

reasoning, expressing "uncertainty about what the alternatives to an 'excess' prescription would

have been . . . ." *Id.* The Court stated:

> Dr. Harris . . . seems to imply that the alternative to an off-label prescription is no prescription at all. . . . Plaintiffs have not presented any evidence to show that, had Zyprexa not been prescribed, no medication would have been prescribed, nor that possible alternatives, such as antidepressants, would have been less expensive than Zyprexa.

*Id.* at 135-36. The Court then summarized:

> All of these variables show that the quantity effect theory is no more demonstrable with generalized proof than the excess price theory. Plaintiffs cannot use generalized proof when individual physicians prescribing Zyprexa may have relied on Lilly's alleged misrepresentations to different degrees, or not at all, when some excess prescriptions may not have actually caused loss, given the likelihood of substitute prescriptions for other drugs, and when different TPPs may have paid for different "excess" quantities of prescriptions.

*Id.* at 136 (citing *Hemi Group*, 130 S. Ct. at 992).

After "declin[ing] to affirm class certification based on the quantity effect theory," *id.* (alteration added), the Second Circuit vacated the district court's order denying summary judgment to Lilly. First, the Court held that the Excess Price Theory was no longer viable in light of *Hemi Group*, stating, "[a]fter *Hemi Group*, it is clear that plaintiffs' overpricing theory is too attenuated to 'meet RICO's requirement of a direct causal connection between the predicate offense and the alleged harm.'" *Id.* (citing *Hemi Group*, 130 S. Ct. at 990). Because the district court had "not consider[ed] individual claims under the quantity effect theory when it ruled on Lilly's motion for summary judgment," *id.* (Brackets added), the Court declined to consider whether summary judgment with respect to the quantity effect theory was appropriate. However, the Second Circuit noted, "The quantity effect theory . . . is less attenuated, and while that theory

cannot support class certification, it is not clear that the theory is not viable with respect to individual claims by some TPPs or other purchasers." *Id.*

In his R&R, Judge Reyes relies on *Zyprexa* in recommending that this Court grant the Defendants' motion for summary judgment. However, Judge Reyes does not rely upon the portions of *Zyprexa* which addressed the motion for summary judgment in that case. Rather, the R&R relies on *Zyprexa* for the proposition that RICO causation cannot be proved through generalized proof. Judge Reyes reasons that, since Plaintiffs rely entirely on generalized proof, they cannot prove their civil RICO claims and Defendants are entitled to summary judgment on the Second Amended Complaint's first two causes of action.

Plaintiffs object to this portion of the R&R on various grounds. First, referencing arguments raised in connection with the motion for class certification, Plaintiffs argue that "*Zyprexa* is both wrong and distinguishable from this case." Objections at 13. Plaintiffs concede "that doctors consider a multitude of variables when making prescription decisions, including issues individual to each patient," but argue that safety considerations are central to the prescription decision and are "always considered in treatment decision making." *Id.* at 15. Thus, Defendants' "omission of critical safety information about Ketek's serious liver risks affected . . . all Ketek prescription decisions for sinusitis and bronchitis indications at issue," as evidenced by the fact that "prescriptions for these two indications . . . completely disappeared" after the liver risks were disclosed. *Id.* at 14 (emphasis omitted). Plaintiffs argue that these facts are sufficient to establish RICO causation in this case. *Id.* In addition, Plaintiffs argue that the federal rules permit the use of aggregate proof and that such proof is the only feasible and reliable way to establish the effects of Defendants' wrongdoing. *Id.*

34

To begin, this Court does not believe that *Zyprexa* was wrongly decided. However, even if it were, this Court would nonetheless be obligated to follow it. As Judge Reyes correctly notes in his R&R, "district courts are bound 'to follow controlling precedents of the courts of appeals for their circuits.'" 2012 WL 4336218, at *3 (quoting *Jackson v. Good Shepherd Servs.*, 683 F. Supp. 2d 290, 292 (S.D.N.Y. 2009)).

This Court agrees with Plaintiffs that this case is distinguishable from *Zyprexa*, albeit not in ways that are material to the outcome of this case. In *Zyprexa*, the alleged racketeering enterprise—which the plaintiffs in that case dubbed "the Off-Label Promotion Enterprise"—was alleged to be engaged in mail and wire fraud aimed at promoting the off-label use of Zyprexa by misrepresenting the drug's safety and efficacy. *Zyprexa*, 620 F.3d at 131. Accordingly, Lilly's wrongdoing was primarily aimed at physicians and consumers. In this case, the "Study 3014 Enterprise" primarily sought to obtain FDA approval "for as many indications as possible, despite the lack of adequate safety studies, the lack of superior efficacy and inferior safety profile compared to other safer, less expensive antibiotics already sold in the U.S. market." Second Amended Complaint at ¶ 80. Having obtained FDA approval, Defendants then represented to physicians and consumers "that Ketek had valid regulatory approval for broad antibiotic uses." Second Amended Complaint at ¶ 74.

The causal chain in this case, therefore, is slightly longer than in *Zyprexa*. To prove liability under the Quantity Effect Theory, for example, the plaintiffs in *Zyprexa* had to establish: "TPPs place Zyprexa on their formularies as approved drugs, Lilly distributes misinformation about Zyprexa, physicians rely upon the misinformation and prescribe Zyprexa, and TPPs pay for too many Zyprexa prescriptions." *Zyprexa*, 620 F.3d at 135. In order to prove liability under the

Quantity Effect Theory in this case, Plaintiffs have to establish that Defendants fraud resulted in FDA approval for additional indications, that Plaintiffs placed Ketek on their formularies as approved drugs, that Defendants represented to physicians and consumers that Ketek had valid regulatory approval for broad antibiotic uses, that these representations resulted in "excess" prescriptions for Ketek, and that Plaintiffs paid for these excess prescriptions.

Given the length of the causal chain, this Court has concerns as to whether the causal connection between Defendant's alleged wrongdoing and Plaintiffs injury might be too attenuated to meet RICO's causation requirement. As noted above, there are multiple steps between Defendants' alleged wrongdoing and Plaintiffs' alleged injury. However, even assuming, *arguendo*, that the chain of causation is not too attenuated, Plaintiff cannot prove causation through generalized proof for the same reasons stated in *Zyprexa*. First, here as in *Zyprexa*, Plaintiffs' "theory of causation is interrupted by the independent actions of prescribing physicians." *Zyprexa*, 620 F.3d at 135. A physician's decision regarding what antibiotic to prescribe can be based on a number of factors: the patient's diagnosis, past and current medications being taken by the patient, the physician's (and the patient's) experience with a particular antibiotic, and the physician's knowledge of the side effects of the antibiotics. *See id.* Thus, even assuming that safety considerations are "central," as Plaintiffs contend, those considerations are not necessarily determinative of a doctor's decision regarding what to prescribe.

Obviously, in situations where the health risks of a drug are extremely severe, safety considerations might be the sole determinant of a physician's decision. Plaintiff suggests that this case presents such a situation, asserting that "doctors stopped prescribing Ketek" when

36

"information [regarding the medication's hepatic side effects] became available." Objections at 4. However, Plaintiffs' assertions are inconsistent with the actual prescription figures, as reflected in a chart reproduced in Judge Reyes' Prior R&R, 2011 WL 824607, at *9. Sales did not drop to zero immediately after the FDA issued a public health advisory relating to Ketek's liver toxicity in January 2006. Rather, sales declined in a manner consistent with the cyclical manner in which sales had declined during the same months the previous year.

Even assuming that the decline in Ketek sales was caused exclusively by safety considerations, one cannot use generalized proof to determine the injury to Plaintiffs caused by Defendants' misconduct. Here, as in *Zyprexa*, determination of the extent of Plaintiffs' financial injury as a result of Defendants' deception is complicated by uncertainty as to what alternatives to Ketek would have been prescribed had doctors known of Ketek's true efficacy and side effects. Given the existence of other antibiotics, one cannot assume that the alternative to a Ketek prescription would be no prescription at all and permit Plaintiffs to recover the entire amount they expended on Ketek prior to the exposure of Defendants' fraud. Rather, to calculate the injury to Plaintiffs, one would have to consider several variables, including the alternatives to Ketek that could be prescribed for a particular condition and the relative costs of those alternatives.

The variables discussed above distinguish this case from *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108 (2d Cir. 2013), the case on which Plaintiffs principally rely in their Second Notice of Supplemental Authority. That case involved fraud by a large food distributor—U.S. Foodservices, Inc., or "USF"—which contracted to supply its customers with goods at a set mark-up over USF's costs. The RICO scheme "centered on six Value Added

Service Providers ('VASPs'), which . . . allege[dly] were shell companies established and controlled by USF for the purpose of fraudulently inflating USF's cost to its customers." *Id.* at 113 (ellipses and brackets added).

In upholding class certification in a suit brought by USF's customers, the Second Circuit emphasized the lack of variables. For example, the Second Circuit noted, *inter alia*, that "the thrust of the RICO claim is USF's scheme to create and employ the VASPs to inflate the invoices so as to overbill each class member *in the exact same manner*," *id.* at 119 (emphasis in original); that "USF's cost-plus contracts" with various customers were "substantially similar in all material respects," *id.*; that there was no need for individual proof that customers relied on the fraudulent representations because payment of the inflated invoices could "constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed," *id.* at 120; and that calculation of damages was "straightforward: customers are entitled to the difference between the amount they paid on fraudulently inflated cost-plus invoices and the amount they should have been billed." *Id.* at 123. Accordingly, *In re U.S. Foodservice Inc. Pricing Litigation* was unlike this case in that there were no customer-specific variables to interrupt the chain of causation between the alleged fraud and the injury to the plaintiff class.[1]

[1] This Court sees no need to discuss the out-of-Circuit cases cited in Plaintiffs' supplemental submissions in detail. While this Court recognizes that the First Circuit has rejected the view that RICO causation cannot be established through generalized proof, *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60, 69 (1st Cir. 2013), *cert. denied sub nom Pfizer Inc. v. Kaiser Found. Health Plan, Inc.*, 134 S.Ct. 786 (2013), the First Circuit's opinion, unlike *Zyprexa*, is not controlling on this Court. Indeed, even if this Court were to find the First Circuit's reasoning persuasive, it would nonetheless be obliged to follow Second Circuit

For the reasons stated above, this Court agrees with Judge Reyes' conclusion that individualized proof would be necessary to establish RICO causation in this case. Since Plaintiffs do not argue that they are prepared to offer individualized proof, this Court also agrees with Judge Reyes' conclusion that Defendants are entitled to summary judgment on the RICO claims.

### III. The State Law Claims

In addition to moving to dismiss the RICO claims raised in Counts I and II of Plaintiffs' Second Amended Complaint, Defendants move to dismiss the state-law claims raised in Count III and IV. Count III alleges that Defendants, through misrepresentations and omissions of material fact aimed at Plaintiffs, the Class and "the medical and scientific community," engaged in unfair competition or unfair or deceptive acts or practices in violation of 43 state statutes, including 815 Ill. Comp. Stat. 505/2, *et seq.*; Mass. Gen. Laws, ch. 93A, §1, *et seq*; and N.Y. Gen. Bus. Law § 349, *et seq.* Count IV alleges that Defendants were unjustly enriched as a result of their alleged wrongdoing and seeks "restitution of Defendants' wrongful profits, revenues and benefits to the extent and in the amount . . . deemed appropriate by the Court . . . ."

### A. Defendants' Motion for Summary Judgment on Count III

In seeking summary judgment on Count III, Defendants assert that "Plaintiffs cannot prove violations of any state consumer protection act." Defendants' Memo at 19. However, noting that "Plaintiffs' Complaint does not state under which state consumer protection acts

---

precedent. *See Jackson*, 683 F. Supp. 2d at 292. This Court does not view the Supreme Court's recent refusal to review the First Circuit's decision as implying a rejection of *Zyprexa*. After all, the Supreme Court also declined to grant certiorari in *Zyprexa* a year and one-half ago. *See Sergeants Benev. Ass'n Health & Welfare Fund v. Eli Lilly Co.*, —U.S.—, 131 S. Ct. 3062 (2011).

Plaintiffs bring their individual claims," Defendants assume that Plaintiffs are suing either "under the state consumer protection acts of their home states, New York, Illinois, and Massachusetts," or Defendants' home state of New Jersey. *Id.* at 19 & n. 17. Accordingly, Defendants do not analyze the consumer protection statutes of any other states other than New York, Illinois, Massachusetts, and New Jersey, but "reserve the right" to make arguments "[t]o the extent Plaintiffs' response to Defendants' Motion for Summary Judgment clarifies Plaintiffs' individual claims." *Id.* at 19, n. 16.

Some of Defendants' arguments for summary judgment are state specific. First, citing to *In re Rezulin Products Liability Litigation*, 392 F. Supp. 2d 597, 614 (S.D.N.Y. 2005) ("*Rezulin*"), Defendants argue that "Plaintiffs' . . . claims under New York law fail because the alleged deceptive conduct of Defendants was not directed *at consumers.*" Defendants' Memo at 19 (emphasis in original). Defendants also rely on *Rezulin* in arguing that Plaintiffs' claims under New Jersey's consumer fraud act fail "for the same reason—the alleged fraud was not directed at consumers." *Id.* at 19, n. 17.

The remainder of Defendants' arguments apply to all of Plaintiffs' home states. Defendants cite to various cases for the proposition that the consumer protection acts in Plaintiffs' home states "require that a plaintiff prove that the alleged wrongful conduct by the defendant caused an actual injury to the plaintiff." *Id.* at 19. Defendants argue that Plaintiffs have no proof that either "individual prescribing physicians" or "their own PBMs relied on Defendants' alleged fraud and thereby caused Plaintiffs' economic injury." *Id.* at 20. In addition, Defendants argue that "Plaintiffs themselves did not take any action as a result of Defendants' alleged fraud that caused them economic injury." *Id.*

## B. *Plaintiffs' Opposition to Defendants' Motion regarding Count III*

In their opposition to Defendants' Motion, Plaintiffs clarify that they are seeking to sue under the consumer protection laws of all states in which doctors prescribed Ketek for a condition other than CAP which was filled by one of their beneficiaries. Plaintiffs' Opposition at 21. Plaintiffs assert that there are "at least nineteen different states" in which these prescriptions were written and filled: Arizona, California, Connecticut, Florida, Georgia, Louisiana, Massachusetts, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah and Washington. *Id.* at 21 & n. 116. However, because Defendants' arguments related to only four of these states, Plaintiffs' Opposition does not discuss the laws of the other fifteen states.

In addressing Defendants' arguments, Plaintiffs distinguish *Rezulin* on its facts. Plaintiffs point out that *Rezulin* involved misrepresentations allegedly made to PBMs by a pharmaceutical manufacturer seeking to have its drugs included on formularies. Plaintiffs argue that this case is distinguishable because Plaintiffs "complain of misrepresentations and omissions directed to the health care community at large, including to physicians, not just to PBMs." *Id.* at 23. Plaintiffs further argue that this case is analogous to *Gaidon v. Guardian Life Ins. Co.*, 94 N.Y.2d 330 (N.Y. 1999), which involved "an extensive marketing campaign" with a "a broad impact on consumers at large." Plaintiffs' Opposition at 23.

Plaintiffs also argue that the laws of Plaintiffs' home states do not require proof of reliance on Defendants' misrepresentations. Citing to several Massachusetts and Illinois cases, Plaintiffs argue that causation can be established through evidence that "the deceptive advertising could reasonably be found to have caused a person to act differently from the way he [or she]

otherwise would have acted. . . ." *Id.* at 22 (internal quotations omitted, brackets in original). In addition, Plaintiffs argue that actual injury can be established simply from the fact that physicians stopped prescribing Ketek after the truth regarding its safety and efficacy emerged. *Id.*

In their reply papers, Defendants cite to cases from all nineteen states listed by Plaintiffs in arguing that "the consumer fraud statutes of each of the states . . . require proof of causation and/or actual injury." Defendants' Reply Memorandum of Law ("Defendants' Reply") at 6. Defendants argue that Plaintiffs cannot prove that Defendants' alleged fraud caused them to pay for Ketek prescriptions because they have not offered any evidence that their PBMs' placement of Ketek on their formularies would have been different if they had known of Ketek's "'true' safety and efficacy" and cannot "show that the physicians who prescribed Ketek would have written a different prescription but for the alleged fraud." *Id.* at 8. Defendants also argue that this case is similar to *Rezulin* and distinguishable from *Gaidon* because the misrepresentations at issue were made to sophisticated parties rather than consumers. *Id.*

### C. Judge Reyes' Recommendations and Plaintiffs' Objections Thereto

Relying on *Rezulin* and *In re K-Dur Antitrust Litigation*, Civil Action No. 01-1652 (JAG), 2008 WL 2660783, at *5 (D.N.J. 2008) (report and recommendation of Special Master) ("*K-Dur*"), Judge Reyes recommends that this Court consider only those state-law claims that arise under the laws of Plaintiffs' home states. *Sergeants III*, 2012 WL 4336218, at *5. Judge Reyes then analyzes Plaintiffs claims under the New York, Massachusetts and Illinois statutes named in Count III of the Second Amended Complaint. With respect to New York law, the magistrate judge notes that New York General Business Law § 349 protects against deceptive acts and unlawful practices that are "consumer oriented," but that the acts and practices in this

42

case were aimed at sophisticated parties, not consumers. 2012 WL 4336218, at *5-*6. Second, principally relying on *Rule v. Fort Dodge Animal Health, Inc.*, 604 F. Supp. 2d 288 (D. Mass. 2009), *aff'd*, 607 F.3d 250 (1st Cir. 2010), Judge Reyes concludes that Plaintiffs cannot establish the actual injury necessary to make out a claim under chapter 93A of the Massachusetts General Laws. 2012 WL 4336218, at *6. Finally, citing to *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 850 (Ill. 2005), Judge Reyes holds that Plaintiffs must prove "that they suffered actual damage proximately caused by [Defendants'] alleged deception to prevail on their Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") claim." 2012 WL 4336218, at *7 (alteration added). Judge Reyes concludes that Plaintiffs lack such proof for "the same reasons Plaintiffs were unable to establish RICO causation." *Id.*

Plaintiffs object to all of Judge Reyes' recommendations. First, Plaintiffs again argue that *Rezulin* is distinguishable because it involved misrepresentation to the PBMs alone, not to "the health care community at large." Objections at 17. Second, Plaintiffs cite to several Second Circuit cases for the proposition that HBPs are "consumers" under New York law, and argue that omissions which have a broad impact on consumers violate New York General Business Law § 349. Objections at 17-18. Third, Plaintiffs assert that the evidence they have adduced is sufficient to establish actual injury under chapter 93A of Massachusetts General Law and the ICFA. Objections at 18-19.

### D. Discussion regarding Count III

Before addressing the merits of the claims set forth in Count III of Plaintiffs' Second Amended Complaint, this Court must address the question of what state law violations must be

considered in this case. In his R&R, Judge Reyes, principally relying on *Rezulin*, 392 F. Supp. 2d at 611 n. 85, recommends that this Court consider only those state-law claims that arise under the laws of Plaintiffs' home states. 2012 WL 4336218, at *5. Plaintiffs object to this portion of the R&R, arguing that the cases on which Judge Reyes relied are distinguishable. Objections at 16-17.

This Court agrees with Plaintiffs. To be sure, *Rezulin* involves facts which seem similar to the case at bar. In *Rezulin*, as here, the plaintiffs were health benefit plans which claimed that the defendant, a pharmaceutical company, misrepresented the safety and efficacy of one of its drugs. However, in *Rezulin*, unlike this case, "[t]he premise of the suit [was] . . . that the plaintiffs would have excluded Rezulin from their formularies and thus paid less . . . if [the defendant] had not made those alleged misrepresentations." 392 F. Supp. 2d at 599.

In the portion of the *Rezulin* opinion quoted by Judge Reyes, Judge Kaplan addressed the question of whether a New York plaintiff, "ES," could assert "claims under the consumer protection and deceptive trade practices statutes of 26 states"—namely, New York and 25 other states in which the drug at issue was dispensed to ES's beneficiaries. *Id.* at 611. However, ES was "not suing derivatively for injury to its members," but rather for misrepresentations made by the New Jersey-based pharmaceutical company, "WL," to the plaintiff and its New Jersey-based pharmacy benefits manager, "Medco." *Id.* at 611, n. 85. Since there was "nothing in the record to suggest that activities in connection with the misrepresentations occurred anywhere other than New Jersey and, perhaps, New York," the only "potentially relevant states" were "(1) New York, the state in which ES is based and in which it suffered injury, and (2) New Jersey, the state in which WL and Medco are based and in which WL made the alleged misrepresentations to

Medco." *Id.* at 611 & n. 85. The laws of the states in which the drug was distributed to plan beneficiaries were "immaterial." *Id.* at 611, n. 85.

In this case, however, Plaintiffs claim that Defendants' misrepresentations and omissions were "directed to the health care community at large, including physicians, not just to PBMs" or HBPs. Plaintiffs' Opposition at 23. Thus, the misrepresentation and omissions at issue in this case were made in states in which the physicians who prescribed Ketek to Plaintiffs' members practiced, not just in the states in which the HBPs or their PBMs were based. This Court cannot, therefore, cannot rely on *Rezulin* in dismissing all claims brought under the laws of states other than New York, Illinois and Massachusetts—the states in which Plaintiffs are based.[2]

In their motion for summary judgment, Defendants analyze only the New York, Illinois, Massachusetts, and New Jersey laws listed in Count III of the Second Amended Complaint. Indeed, while Defendants' Memo reserved the right to make arguments relating to any other state laws on which Plaintiffs relied, Defendants' Memo at 19, n. 16, arguments relating to other state laws first appeared in Defendants' Reply. Since Plaintiffs have not had a chance to respond to these arguments, this Court will not address them at this time. Rather, this Court will address only the arguments relating to New York, New Jersey, Illinois and Massachusetts law at this time.[3]

---

[2] The other case cited by Judge Reyes in his R&R—*In re K-Dur Antitrust Litigation, supra,* 2008 WL 2660783—is also distinguishable. That case involved anti-trust claims brought by TPPs on their own behalf. Noting that "a Plaintiff's home state has a paramount interest in protecting its citizens from the kind of anticompetitive conduct alleged in this case," *id.* at *4, the special master who authored the report and recommendation in *K-Dur* concluded that the laws of the individual TPPs home states should govern their antitrust claims.

[3] Defendants can renew their argument relating to the other state laws after Plaintiffs amend Count III of their pleading to clarify the state laws under which they actually seek to recover.

### 1. New York Law

Section 349(a) of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. "As enacted in 1970, the statute entrusted sole enforcement power to the Attorney-General." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24, 647 N.E.2d 741, 744 (N.Y. 1995). However, in 1980, the Legislature enacted section 349(h), which creates a private right of action for "any person who has been injured by reason of any violation of [§ 349]."

In order to make out a claim under § 349, a plaintiff must prove three elements: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 611 (N.Y. 2000). In their motion for summary judgment, Defendants argue that Plaintiffs cannot make out the first or third element. However, Judge Reyes' R&R addressed only the first of these elements, recommending that this Court grant Defendants summary judgment on the ground that Defendants' acts or omissions were not consumer-oriented. *Sergeants III*, 2012 WL 4336218, at *5-*6.

The "consumer-oriented" element has its origins in *Oswego Laborers' Local 214 Pension Fund, supra*—a case brought by two union funds against a bank to recover lost interest. In that case, the Court of Appeals limited the scope of the statute by defining the term "deceptive acts and practices" to mean "representations or omissions . . . likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26; 647 N.E.2d at 745. However, while recognizing that § 349 was "directed at

46

wrongs against the consuming public," *id.*, 85 N.Y.2d at 24; 647 N.E.2d at 744, the Court of

Appeals did not limit the protection of the statute to unsophisticated consumers. Rather, the

Court of Appeals made clear that "plaintiffs claiming the benefit of section 349" could be

"entities such as the plaintiffs" in that action—union funds similar to Plaintiffs. *Id.*, 85 N.Y.2d at

25; 647 N.E.2d at 744. Indeed, even "corporate competitors . . . have standing to bring a claim

under this [statute] . . . so long as some harm to the public at large is at issue." *Securitron*

*Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (quoting *Bristol-Myers Squibb*

*Co. v. McNeil-P.P.C., Inc.*, 786 F. Supp. 182, 215 (E.D.N.Y.), *vacated in part on other grounds*,

973 F.2d 1033 (2d Cir. 1992)) (brackets and second set of ellipses in *Schnabolk*; first set of

ellipses added).

In requiring that the defendant's conduct be "consumer-oriented," the Court of Appeals

sought to exclude from the scope of the statute "[p]rivate contract disputes" and other conduct

"unique to the parties." *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 25; 647

N.E.2d at 744. Thus, the Court required plaintiffs to "demonstrate that the acts or practices have

a broader impact on consumers at large." *Id.* Even though the parties in *Oswego Laborers'*

*Local 214 Pension Fund* were both sophisticated parties, "defendant Bank dealt with plaintiffs'

representative as any customer entering the bank to open a savings account, furnishing the Funds

with standard documents presented to customers upon the opening of accounts." *Id.*, 85 N.Y.2d

at 26; 647 N.E.2d at 745. Noting that "[t]he account openings were not unique to these two

parties, . . . private in nature or a 'single shot transaction,'" the Court of Appeal held that the

union funds "satisfied the threshold test in that the acts they complain of are consumer-oriented

in the sense that they potentially affect similarly situated consumers." *Id.*, 85 N.Y.2d at 26-27; 647 N.E.2d at 745.

Similarly, the New York Court of Appeals held that the consumer-oriented requirement was satisfied by the plaintiffs in *Gaidon v. Guardian Life Ins. Co.*, *supra*, a putative class action brought on behalf of those who had purchased a particular type of life insurance policy from the defendants. Although the named plaintiffs included the trustees of trust funds, the Court of Appeals focused on the nature of the defendants' allegedly wrongful practices, rather than the named plaintiffs' level of sophistication. The Court held that, "[i]n contrast to a private contract dispute as to policy coverage," the defendants' practices "involved an extensive marketing scheme that had 'a broader impact on consumers at large.'" *Gaidon*, 94 N.Y.2d at 344, 725 N.E.2d at 603.

In construing § 349, the Second Circuit has expressly recognized that misrepresentations to regulatory entities can constitute "consumer-oriented" acts or omissions. In *Securitron Magnalock*, *supra*, the manufacturer of electromagnetic locks and related locking system equipment brought a § 349 claim against the president of one of its competitors, alleging that the defendant had, *inter alia*, made false statements to the New York City Bureau of Standards and Appeals ("BSA") concerning the plaintiff's products. After a jury found for the plaintiff on the §349 claim, the defendant appealed, arguing that there was "absolutely nothing . . . showing that this private commercial dispute between the plaintiff and the defendant was aimed at the public." *Securitron Magnalock*, 65 F.3d at 264 (emphasis omitted). The Second Circuit rejected that argument, stating:

> We think that the harm to the public was manifest. The evidence
> demonstrated that appellants gave false information about the
> Securitron Magnalock to the BSA, a regulatory agency primarily
> concerned with the safety of the public. Schnabolk caused the BSA
> to undertake unnecessary investigations and interfered with its
> decision making process by complaining of non-existent "potential
> danger . . . in fire safety situations." His activities in this respect
> surely were contrary to the public interest.

*Id.*

In light of *Gaidon* and *Securitron Magnalock*, this Court cannot find that Defendants'

alleged wrongdoing was not consumer-oriented. In this case, as in *Gaidon*, the alleged

wrongdoing is a marketing scheme aimed at the consuming public. As in *Securitron Magnalock*,

the alleged wrongdoing involved misrepresentations to a regulatory agency which were

calculated to infect the agency's decision-making processes in Defendants' favor and to the

possible detriment of consumers. Although these same misrepresentations may also have been

made to PBMs, this was not a case, like *Rezulin*, in which the misrepresentations were made

exclusively to PBMs.

Nonetheless, this Court finds that Plaintiffs cannot make out a violation of § 349 because

they lack the evidence to prove the third element: that they suffered injury as a result of

Defendants deceptive acts. While "reliance is not an element of a section 349 claim," Plaintiffs

"must prove 'actual' injury to recover under the statute." *Stutman*, 95 N.Y.2d at 29, 731 N.E.2d

at 612. That injury need not be pecuniary, *id.*, but it cannot be indirect or derivative. *See City of*

*New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 622, 911 N.E.2d 834, 838 (N.Y. 2009).

In this case, Plaintiffs have not adduced sufficient proof of actual injury. Plaintiffs

contend that, "[w]hile the truth remained hidden, . . . Plaintiffs paid thousands of dollars for

hundreds of Ketek prescriptions," and that Plaintiffs are entitled to recover these payments from Defendants. Plaintiffs' Opposition at 22. However, this analysis assumes that Plaintiffs would not have had to pay for any antibiotics at all had no misrepresentations been made. There is simply no evidence to support this highly dubious proposition.

To be sure, this Court perceives ways in which Plaintiffs might have suffered actual injury as a result of Defendants' actions. For example, Plaintiffs could have suffered actual injury if its beneficiaries sustained liver damage as a result of using Ketek or if Defendants' misrepresentations caused Ketek to be prescribed for conditions for which it was ineffective, necessitating prescriptions for a second round of antibiotics. However, Plaintiffs have not adduced proof of any such circumstances. Moreover, even if they had, such proof might be too indirect or derivative to make out actual injury for purposes of § 349. *See, e.g., Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.,* 3 N.Y.3d 200, 207, 818 N.E.2d 1140, 1145 (N.Y. 2004) ("Although [the insurer] actually paid the costs incurred by its subscribers, its claims are nonetheless indirect because the losses it experienced arose wholly as a result of smoking related illnesses suffered by those subscribers."); *see also Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 239 (2d Cir. 1999) (injuries held to be indirect where they were "purely contingent on harm to third parties").

### 2. *Massachusetts Law*

Plaintiffs have also failed to make out a claim under chapter 93A of Massachusetts General Law. Section 9(1) of chapter 93A creates a private right of action in favor of any person "who has been injured" by another's unfair or deceptive act. To prove a claim under chapter 93A, section 9(1), a plaintiff "must establish (1) that the defendant has committed a violation of

G.L. c. 93A, § 2; (2) injury; and (3) a causal connection between the injury suffered and the defendant's unfair or deceptive method, act, or practice." *Herman v. Admit One Ticket Agency LLC*, 454 Mass. 611, 615-16, 912 N.E.2d 450, 454 (Mass. 2009).

In his R&R, Judge Reyes focused on the second element, concluding that defendants' conduct did not cause cognizable injury. In reaching his conclusion, Judge Reyes relied on *Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d 250 (1st Cir. 2010), a case brought by a dog owner who had purchased and administered a heartworm medicine, ProHeart 6, to her pet. After learning that the medicine had risks which the manufacturer had concealed at the time of her purchase, the plaintiff commenced a putative class action to recover "the difference between the price . . . actually paid for ProHeart 6 and what it would have been worth had safety risks been adequately disclosed." *Rule*, 607 F.3d at 251-52. Essentially, the plaintiff argued that "she purchased Proheart 6 because of a deception (failure to disclose the risk), the product was 'in reality' worth less than she paid for it (because of that undisclosed risk), and so she suffered damage measured by the difference between what she paid and what she would have paid if the risk had been disclosed." *Id.* at 253 (parentheticals in original).

In holding that the plaintiff had not suffered a cognizable injury, the First Circuit distinguished *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 888 N.E.2d 879 (Mass. 2008), a class action in which owners of vehicles with allegedly defective door latches alleged a violation of chapter 93A. Although the plaintiffs' own doors had not malfunctioned, the Supreme Judicial Court of Massachusetts ruled that the plaintiffs had suffered an economic loss redressable under chapter 93A. *Id.*, 451 Mass. at 630, 888 N.E.2d at 886. Specifically noting that the plaintiffs continued to own the vehicles, the Supreme Judicial Court held that the defective vehicles were

worth less than the safety-standard-compliant vehicles the plaintiffs thought they were purchasing and that the plaintiffs' overpayment constituted economic loss compensable under chapter 93A.

In *Rule*, the First Circuit noted, the pet owner no longer owned any ProHeart 6. Having administered it to her pet, she had obtained the benefits of the product. However, her pet had not suffered any of the adverse health effects—the risks of which caused the product to be worth less. Accordingly, the First Circuit concluded that plaintiff had suffered no economic damage since she obtained the heartworm protection sought without any detriment from the concealed latent defect. *Rule*, 607 F.3d at 254-55.

The First Circuit's conclusion was consistent with the result in *Hershenow v. Enterprise Rent-A-Car Co.*, 445 Mass. 790, 840 N.E.2d 526 (Mass. 2006), a case brought by rental-car customer who had purchased collision damage waivers that contained onerous provisions which violated state law. Although the plaintiffs had returned their cars without damage—giving the rental company no occasion to seek to enforce the allegedly unlawful restrictions—the plaintiffs nonetheless sued the rental car company under chapter 93A. The Supreme Judicial Court, noting that the plaintiffs were not "worse off during the rental period" than if the waiver had fully complied with statutory requirements, held that the plaintiffs could not demonstrate that the illegal contract had caused them any loss or injury. *Hershenow*, 445 Mass. at 800-01, 840 N.E.2d at 535. As the First Circuit noted, *Hershenow* "dooms a claim that an undisclosed risk that is never realized and can never be realized in the future constitutes damages merely because it existed at an earlier stage." *Rule*, 607 F.3d at 254.

In seeking damages under chapter 93A in this case, Plaintiffs are not making the exact argument rejected by *Rule* and *Hershenow*. The plaintiffs in those cases were explicitly advancing a price effect theory: namely, that they bought a product which was worth less than it would have been absent its potential risks. Plaintiffs herein argue that doctors would not have prescribed Ketek, and that they would have never paid for Ketek, absent Plaintiffs' deceptive acts and omissions.

The narrow definition of injury enunciated in *Rule* and *Hershenow*, however, dooms Plaintiffs' chapter 93A claims. Even assuming that doctors would not have prescribed Ketek and that Plaintiffs would not have paid for Ketek, there is no evidence that Plaintiffs suffered any injury for purposes of chapter 93A. Plaintiffs provide no proof that the severe, but rare, risks of Ketek use were ever realized by any of their beneficiaries who took the medicine, causing Plaintiffs' to incur additional expenses. Moreover, there is no proof that Ketek proved ineffective, causing Plaintiffs to have to pay for a second round of antibiotics. In addition, Plaintiffs do not contend that they themselves possess any Ketek for which they might seek a refund. Accordingly, Plaintiffs have not established an injury of the sort compensable under chapter 93A.

### 3. Illinois Law

Plaintiffs have also not made out a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.* (the "ICFA"). Section 2 of the ICFA prohibits, *inter alia*, "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely

53

upon the concealment, suppression or omission of such material fact . . . ." Section 10a(a) of the ICFA provides a private cause of action for violations of section 2, stating, in pertinent part, "[a]ny person who suffers actual damage as a result of a violation of [the ICFA] committed by any other person may bring an action against such person."

Although section 2 expressly provides that "unfair or deceptive acts or practices" are unlawful regardless of "whether any person has in fact been misled, deceived or damaged thereby," the Supreme Court of Illinois has held that that provision applies only to actions brought by the Attorney General. *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 149, 776 N.E.2d 151, 160 (Ill. 2002). In contrast, the Supreme Court has read the language of section 10a as imposing a proximate causation requirement. *Id.* Thus, "[t]o prove a private cause of action under section 10a(a) of the Act, a plaintiff must establish: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 180, 835 N.E.2d 801, 850 (Ill. 2005) (citing *Oliveira*, 201 Ill.2d at 149, 776 N.E.2d at 160).

In his R&R, Judge Reyes recommends dismissing Plaintiffs claims under the ICFA, stating that, "[f]or the same reasons Plaintiffs were unable to establish RICO causation," Plaintiffs cannot prove that Defendants' "alleged deception caused them actual harm." *Sergeants III*, 2012 WL 4336218, at *7. In support of this conclusion, Judge Reyes cites to *Siegel v. Shell Oil Co.*, 612 F.3d 932 (7th Cir. 2010), a putative class action brought by a gasoline consumer who asserted that the defendant oil companies acted in concert by manipulating refinery margins and

capacity to reduce the nation's supply of gasoline and, thereby, caused him to purchase the defendants' branded gasoline at artificially inflated prices. In particular, Judge Reyes cites to that portion of *Siegel* in which the Seventh Circuit held that the plaintiff could not "show that the defendants' conduct caused him to purchase their gasoline, because many factors contributed to Siegel's gasoline purchasing decision." *Siegel*, 612 F.3d at 937.

In their objections to the R&R, Plaintiffs essentially concede that the causation analysis under the ICFA is "similar" to RICO causation. Objections at 19. Plaintiffs argue that they "satisfy RICO causation," and "likewise satisfy causation under [the ICFA]." *Id.* Plaintiffs do not cite to any Illinois or Seventh Circuit cases in support of this argument and make no effort to distinguish *Siegel*.

For purposes of this memorandum and order, there is no need to gauge the degree of similarity between RICO causation and the causation requirement under the ICFA. Rather, this Court holds that, for the same reasons noted above, Plaintiffs cannot prove the fourth and fifth elements of an ICFA claim. First, as noted in this Court's analysis pursuant to New York General Business Law § 349, Plaintiffs have not established that they suffered actual harm as a result of Defendants' deceptive acts or omissions. While Plaintiffs may have paid more for Ketek than they would have paid absent Defendants' conduct, there is no evidence that doctors would have prescribed no antibiotics, or less expensive antibiotics, for Plaintiffs' beneficiaries absent the deception. Second, even if Plaintiffs could establish that they suffered actual harm, there would be no way to establish that the harm was caused by the deception. As this Court noted in discussing RICO causation, many factors contribute to a physician's decision of what antibiotic to prescribe. Plaintiffs' generalized proof is insufficient to establish that those

physicians who would have prescribed a less expensive antibiotic than Ketek (or no antibiotic at all) would not have prescribed Ketek absent Defendants' deceptive acts and omissions.

### E. Defendants' Motion for Summary Judgment on Count IV

Unlike Count III, which alleged the violation of 43 specific state statutes, Count IV of Plaintiffs' Second Amended Complaint does not refer to any particular state laws. Count IV alleges that, as a result of Defendants' "conscious wrongdoing," Plaintiffs paid for Ketek "when they otherwise would not have done so and paid for the drug at a higher price than they would have paid but for the Defendants' wrongful conduct." Sec. Am. Complt. at ¶¶ 147, 149. Plaintiffs allege that Defendants "profited and benefitted" from Plaintiffs' payments, and that Plaintiffs are "entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits . . . ." *Id.* at ¶¶ 147, 150.

In seeking summary judgment with respect to Count IV, Defendants analyze Plaintiffs' unjust enrichment claims under the laws of the Plaintiffs' home states: New York, Massachusetts and Illinois. First, citing to various cases, Defendants argue that Plaintiffs lack the sort of direct relationship with Defendants that is necessary to state an unjust enrichment claim under New York law. Defendants' Memo at 21-22. Second, Defendants argue that, "[u]nder Illinois law, unjust enrichment does not exist as a separate claim and fails when the underlying fraud claim fails." *Id.* at 21. Third, citing to *Smith v. Jenkins*, 626 F. Supp. 2d 155, 170 (D. Mass. 2009), and *Lopes v. Commonwealth*, 442 Mass. 170, 179-80, 811 N.E.2d 501, 509 (Mass. 2004), Defendants contend that unjust enrichment is also not a separate cause of action under Massachusetts law. Defendants' Memo at 21. Finally, Defendants assert that under all three of the home states' laws, "Plaintiffs' unjust enrichment claims fail for the simple reason that Plaintiffs cannot prove that

Defendants were unjustly enriched by any payment for Ketek by Plaintiffs." *Id.* at 22.

Defendants contend that "Plaintiffs do not even allege that any Ketek for which they paid was ineffective or caused an adverse effect," and that "Defendants cannot be found to have been unjustly enriched if the Ketek prescribed to Plaintiffs' members and paid for by Plaintiffs performed exactly as represented." *Id.*

### F. Plaintiffs' Opposition to Defendants' Motion relating to Count IV

In opposing Defendants' motion for summary judgment, Plaintiffs do not address Defendants' state-specific claims. Rather, citing to cases from the First, Second and Seventh Circuit Courts of Appeals, Plaintiffs imply that the essential elements of an unjust enrichment claim—that the defendant inequitably retained a benefit to the plaintiff's detriment—are the same in New York, Massachusetts and Illinois. Plaintiffs assert that they have established these essential elements by proving that Defendants "profited handsomely by making material misrepresentations and omissions" about the safety and efficacy of Ketek for non-CAP uses, and that permitting Defendants to retain these benefits would violate "the fundamental principles of justice, equity, and good conscience." Plaintiffs' Opposition at 24.

### G. Judge Reyes' Recommendations and Plaintiffs' Objections Thereto

In his R&R, Judge Reyes declines to "simply presume that unjust enrichment claims are substantially identical across [the three] states." *Sergeants III*, 2012 WL 4336218, at *7 (brackets added). Instead, Judge Reyes details "the nuances of the three jurisdictions' respective unjust enrichment regimes," concluding that Plaintiffs can bring "a standalone unjust enrichment claim" under New York and Massachusetts law, but that an unjust enrichment claim under Illinois law "must be tied to a related action." *Id.*, at *7-*8. After concluding that Plaintiffs'

unjust enrichment claim under Illinois law cannot stand if Plaintiffs' ICFA claim is dismissed, the R&R analyzes Plaintiffs' claims under New York and Massachusetts law and concludes that Plaintiffs did not suffer any detriment and that Defendants are not entitled to recoup the money they paid for Ketek. The R&R notes that "Plaintiffs do not allege that they paid a premium for Ketek due to Defendants' alleged fraud" or "that Defendants artificially inflated Ketek prices." *Id.* at *8.

In their objections to the R&R, Plaintiffs do not specifically address Judge Reyes' finding that Plaintiffs' unjust enrichment claim under Illinois law must fail if Plaintiffs' ICFA claim has been dismissed. Rather, Plaintiffs assert that the laws of Illinois and two other states not mentioned by Plaintiffs or Judge Reyes—Arizona and Louisiana—permit unjust enrichment claims if there is no adequate remedy at law. Plaintiffs also argue that "[t]he unjust enrichment laws of *all* states, including Illinois, New York, and Massachusetts . . . , are fundamentally the same." Objections at 19. Citing to cases from 20 states, Plaintiff assert that each state's unjust enrichment laws "requires a showing that the plaintiff conferred a benefit on the defendant, the defendant accepted or retained the benefit, and it would be inequitable for the defendant to retain the benefit." *Id.*[4] Plaintiffs then repeat the argument made in their opposition to the motion for summary judgment, noting that Defendants "profited handsomely by omitting critical safety information about Ketek, causing consumers like Plaintiffs to pay" thousands of dollars for non-CAP prescriptions. *Id.* at 20.

---

[4] In addition to citing to cases from New York, Massachusetts, and Illinois, Plaintiffs cite to cases from Arizona, California, Connecticut, Florida, Georgia, Louisiana, Missouri, Nevada, New Hampshire, New Jersey, North Carolina, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah and Washington.

### H. Discussion regarding Count IV

Although Plaintiffs' Objections to the R&R address the unjust enrichment laws of 20 states, Defendants' motion for summary judgment addressed the laws of only Plaintiffs' home states: New York, Illinois, and Massachusetts. As Judge Reyes correctly states, this Court cannot simply presume that the unjust enrichment claims are identical in all relevant states. Accordingly, this memorandum and order will discuss only the laws of Plaintiffs' home states. Since this Court has already granted Defendants leave to renew their arguments relating to the consumer protection statutes of states other than Plaintiffs' home states, *see* n. 3, *ante*, this Court will also permit Defendants to renew their arguments relating to the other states' unjust enrichment laws after Plaintiffs amend their complaint to clarify Count IV.

#### 1. Illinois Law

Plaintiffs do not specifically object to that portion of the R&R which holds that Plaintiffs' unjust enrichment claims under Illinois law must be dismissed because they are tied to the ICFA claim which was previously dismissed. Rather, Plaintiffs cite to *F.H. Prince & Co., Inc. v. Towers Financial Corp.*, 275 Ill. App. 3d 792, 804, 656 N.E.2d 142, 151 (Ill. App. 1995), for the proposition that there is no claim for unjust enrichment under Illinois law if there is an adequate remedy at law. Objections at 21. To the extent Plaintiffs are implying that a plaintiff can bring a standalone unjust enrichment claim under Illinois law if a plaintiff lacks an adequate remedy at law, *F.H. Prince* does not support this proposition. That case held only that an unjust enrichment claim which rests on an implied or quasi-contract theory is untenable where there is a specific contract which governs the relationship of the parties. *F.H. Prince*, 275 Ill. App. 3d at 804, 656 N.E.2d at 151.

## 2. *New York and Massachusetts Law*

Plaintiffs object to that portion of the R&R which holds that Plaintiffs have failed to make out unjust enrichment claims under either New York or Massachusetts law. *See* Objections at 20-21. However, Plaintiffs do not explain why Judge Reyes' reasoning is incorrect. Rather, they largely repeat the arguments set forth in their motion for summary judgment.

This Court agrees with Judge Reyes' conclusions. First, the New York Court of Appeals has long held that "[a]n unjust enrichment claim is rooted in 'the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'" *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516, 973 N.E.2d 743, 746 (N.Y. 2012) (quoting *Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337, 339 (N.Y. 1916)). To make out a claim for unjust enrichment under New York law, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 944 N.E.2d 1104, 1110 (N.Y. 2011) (internal quotations and citations omitted; brackets in original). The New York Court of Appeals considers the third element to constitute the "essential inquiry" in any action for unjust enrichment. *Id.* (citing *Paramount Film Distrib. Corp. v. State of New York*, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 393 (1972)).

Like New York Courts, "Massachusetts courts emphasize the primacy of equitable concerns in a finding of unjust enrichment . . . ." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009). "[T]here must be 'unjust enrichment of one party and unjust detriment to another party.'" *Id.* (quoting *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 234 n. 7 (1st Cir. 2005)).

Like Judge Reyes, this Court finds nothing inequitable or unjust in permitting Defendants to retain profits from sales to Plaintiffs' beneficiaries. There is no question that Defendants provided Ketek to Plaintiffs' beneficiaries and that Plaintiffs were contractually obligated to pay on behalf of those beneficiaries. While Defendants may have procured the sales by failing to disclose certain risks and by exaggerating the efficacy of Ketek, there is no evidence that Plaintiffs' beneficiaries suffered any ill-effects or found Ketek to be ineffective. Absent such evidence, there is no reason why Plaintiffs should obtain a full refund. Moreover, Plaintiffs, who disavow reliance on a price effect theory, do not allege that they paid artificially inflated prices for Ketek.

Moreover, even assuming Plaintiffs' beneficiaries suffered ill-effects or found Ketek ineffective, it is those beneficiaries who should be compensated. As Judge Reyes correctly notes, Plaintiffs are not bringing a derivative action on behalf of those beneficiaries. Plaintiffs themselves would not suffer any harm unless they paid extra to treat those ill-effects or to purchase a second round of antibiotics, and there is no evidence that they did so.

## CONCLUSION

For the reasons set forth above, this Court adopts Judge Reyes' report and recommendation dated September 17, 2012, except to the extent that it recommends limiting Plaintiffs' cause of action for violations of various consumer protection statutes to claims brought pursuant to the laws of Plaintiffs' home states of New York, Massachusetts and Illinois. Within 30 days of the date of this memorandum and order, Plaintiffs shall amend Counts III and IV of their pleading as necessary to clarify the scope of, and basis for, their state-law claims, providing, *inter alia*, a list of the states in which their beneficiaries allegedly obtained and filled

61

prescriptions for Ketek. Defendants are granted leave to file a second motion for summary judgment with respect to those state-law claims. Within 15 days after receiving a copy of Plaintiffs' amended pleading, Defendants shall confer with Plaintiffs and submit a proposed briefing schedule with respect to the second motion for summary judgment.

**SO ORDERED.**

/s/(SLT)

SANDRA L. TOWNES
United States District Judge

Dated: May 9, 2014
    Brooklyn, New York